## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Maryann Scheer, f/k/a Maryann Brugnoli,

Plaintiff,

Civ. No. 05-1275 (RHK/JSM)
**MEMORANDUM OPINION AND ORDER**

v.

Best Buy Enterprise Services, Inc.,

Defendant.

David L. Shulman, Law Office of David L. Shulman PLLC, Minneapolis, Minnesota, for Plaintiff.

Joseph G. Schmitt and Nicole J. Druckrey, Halleland Lewis Nilan & Johnson P.A., Minneapolis, Minnesota, for Defendant.

## INTRODUCTION

Plaintiff Maryann Scheer[1] has sued Defendant Best Buy Enterprise Services, Inc. ("Best Buy") alleging she was unlawfully terminated due to her age. Best Buy now moves for summary judgment on the grounds that it terminated Scheer during a reduction-in-force ("RIF") because it determined Scheer's position was expendable, and that age was not a factor in that determination. For the reasons set forth below, the Court will grant Best Buy's Motion.

---

[1] At the time of the incidents giving rise to this action, Plaintiff's name was Maryann Brugnoli.

# BACKGROUND

### 1.    Scheer's Employment History with Best Buy

Scheer began working for Best Buy on October 11, 1998.  (Schulman Aff. Ex. A.)
She worked on the Accounts Payable ("AP") Service and Support team in Best Buy's AP
Merchandise department.  (Shulman Aff. Ex. C; Schmitt Aff. Ex. M; Powers Dep. Tr. at 20.)
The AP Service and Support team reconciled vendors' pending or unpaid invoices and
conducted all of the data entry for Best Buy's installation business.  (Dahl Dep. Tr. at 19-
20.)

Scheer's primary responsibility in AP Service and Support was matching checks with
reports and preparing for mailing to Best Buy clients.  (Scheer Dep. Tr. at 11, 13.)  She
performed this job function for between five and six hours per day.  (Id. at 13.)  She also
spent time entering the checks into a spreadsheet on her computer, cross-training other
employees at their jobs, performing other clerical duties on request, tracking checks to
clients, and monitoring special client requests.  (Id. at 13-14.)  She spent approximately
one half-hour each day performing these functions.  (Id.)

Best Buy gave Scheer several notices of substandard performance during her
employment with the company.  On May 2, 2000, Scheer received a "performance
counseling record" indicating "unacceptable performance."  (Schmitt Aff. Ex. H.)  The
"performance counseling record" indicated that Scheer was expected to "cut down on
visiting."  (Id.)  On September 19, 2003, Michelle Reitan, a supervisor in AP Service and
Support, sent Scheer a personnel file memo outlining numerous performance mistakes and

Best Buy policy violations committed by Scheer.  (Id.)  The memo was a "Final Warning"

notifying Scheer that she "must comply with policies and procedures."  (Id.)  If she failed to

do so, she would receive "[f]urther disciplinary action up to and including termination."

(Id.)  On January 23, 2004, Jerine Hartsch, the AP Service Supervisor, verbally warned

Scheer because she had "commented employees were being treated like children."  (Id.)

Hartsch instructed Scheer that any future problems should "go to [Rich Millerbernd[2]] or

[be] discuss[ed] with [Jarine Hartsch[3]]."  (Id.)

    Best Buy also evaluated Scheer's performance each year and performed periodic

skills assessments.  On April 30, 2003, Reitan completed a "Nonexempt Performance

Appraisal" of Scheer.  (Schmitt Aff. Ex. K.) On this performance appraisal, Scheer received

an overall score of 2.9 on a scale of 1 to 5, which placed her in the category: "Fully

Satisfactory - Performance meets all aspects of the position requirements."   (Id.)  In

August of 2002, Reitan performed a skills assessment of Scheer.  Although no overall

rating was given in specific skill sets, Scheer consistently scored between "2"—"Marginal"

and "3"—"Skilled" with several scores of "3+."  (Schmitt Aff. Ex. K.)  In May 2003,

Melissa Dahl, a supervisor in AP Service and Support, conducted another skills assessment

of Scheer.  (See Schmitt Aff. Ex. P.)  Throughout the evaluation, Dahl consistently gave

Scheer a score of "Minimum Skill" or "Solid."  (Id.)

**2.     Best Buy's RIF**

----

[2]Millerbernd was the manager of AP Service and Support.  (Powers Dep. Tr. at 35.)

[3]Hartsch was a supervisor in AP Service and Support (Schmitt Aff. Ex. H.)

In late 2003, Debra Powers, the Director of Best Buy's AP Merchandise department, began to consider performing a RIF in Best Buy's AP Services and Support. (Powers Dep. Tr. at 5-6, 25-26.)  The RIF was a plan to reduce the number of employees in AP Merchandise in order to lower the department's operating costs.  (Powers Dep. Tr. at 26-29.)  Powers first considered the RIF because it is her responsibility "to always be looking at where I can find efficiencies and cut costs" and, in this case, "when looking at the [AP] area, there [were] some synergies that I saw could be taking place." (Id. at 26-27.) Specifically, Powers considered transferring the "service area" of Best Buy's AP Service and Support team to Best Buy's AP Expense department because both departments used the same Oracle computer system.  (Id. at 17-19.)

In order to conduct the RIF, Powers asked Rich Millerbernd, the manager of AP Services and Support, to analyze which positions could be eliminated from his department and which positions should be transferred to another team in the AP area.  (Powers Dep. Tr. at 39-40, 66.)  Millerbernd enlisted Dahl and Reitan to assist him in performing this analysis.  (Id. at 39-40.)

Millerbernd, with the input of Dahl and Reitan, completed a Staffing Analysis Worksheet ("worksheet") for AP Services and Support (Dahl Dep. Tr. at 44-45, 57-65.)[4] The worksheet has three sections.  The first groups the contingent workers to be retained

---

[4]Based on the fact that Powers' name appears at the top of the worksheets, Scheer alleges Powers completed these worksheets for both AP Service and Support and AP Merchandise Support. (Shulman Mem. in Opp'n at 9; Schmitt Aff. Exs. M, N.)

and includes a rationale for why these workers will be retained.  (Schmitt Aff. Ex. M.)  It also "include[s] information on the group[s] who will be eliminated." (Id.)  In the instant case, this section indicated that two contingent employees were released and none was retained. (Id.)

The second section requires supervisors to list the permanent employees to be terminated during the RIF and the reasons for selecting each individual.  (Schmitt Aff. Ex. M.)  In the instant case this section indicated that five employees would be terminated, including Scheer, and one employee would be demoted.  (Id.)  This section listed Scheer as an "Accounting Assistant 2" and stated this position would be "eliminated due to integration of mail function to A/P Expense and the creation of a centralized check processing function in A/P Expense."[5]  (Id.)

The final section of the worksheet requires a comparison of employees who belong to a group that has been selected for reduction, but not elimination.[6]  Two positions were listed in this section indicating a reduction in the number of employees holding the position title "Associate 2 – Data Entry" or "Associate 4 (Lead)," and employees in these groups were compared to each other to determine which employees would be terminated.

---

[5]The "centralized check processing system" refers to the new Oracle software system.

[6]This section provides a ranking system made up of three parts: the individual's last performance evaluation, her future ability to perform in the redesigned job, and her growth potential.  (Schmitt Aff. Ex. M.)  Two of the five people designated as "Associate 2 – Data Entry" were selected for termination because their scores were the two lowest in the group, Nguyen and Awe.  Awe was rehired 2 months later by Powers when she determined the initial job cuts had been too extensive.  (Mem. in Supp. at 13.)

(Schmitt Aff. Ex. M.)  Because Scheer was the only individual working as an "Accounting Assistant 2," a position that was terminated, she was not listed in the final section of the worksheet.  (Id.)  The "Associate 1" position was not listed in either the second or third sections of the worksheet.  (Id.)  Best Buy had two individuals categorized as "Associate 1" in AP Services and Support, and retained both.  (Shulman Aff. Ex. K.)  Furthermore, one person in the "Associate 1" position of AP Merchandise Support was retained.  (Id.)  All of these individuals retained as "Associate 1" employees were younger than Scheer.[7]

Based on this worksheet, Millerbernd, Dahl, and Reitan recommended to Powers that certain individuals be terminated, including Scheer.  (Dahl Dep. Tr. at 20.)  Prior skills assessments of Scheer were not considered in determining whether Scheer would be retained.  (Id. at 35.)[8]  Furthermore, although Best Buy had a practice of performing an adverse impact analysis on a RIF, it has not produced documentation that one was conducted in the instant case.  (Douglas Dep. Tr. at 150-51.)

Powers accepted all of the recommendations given to her.  (Id. at 20.)  On April 14, 2004, Best Buy informed Scheer that it was terminating her employment as part of the RIF. (Shulman Aff. Ex. G.)  As a result of the RIF, the entire AP Service and Support team was

---

[7]A list of individuals evaluated during the RIF shows that Best Buy retained a 21-year-old and a 38-year-old as Associate 1s in AP Service and Support as well as a 24-year-old Associate 1 in AP Merchandise Support.  (Shulman Aff. Ex. K.)

[8]Although Scheer's data entry skills "didn't meet the requirement of the new position," she would not have been retained if these skills had been better.  (Dahl Dep. Tr. at 36, 38-39) (Q: "Had her speed and accuracy been better, would you have kept her?", A: "Because of the job duties she held and the majority of them being eliminated, no.")

disbanded.  (Powers Dep. Tr. at 31.)  The AP Service and Support team employees who

where not transferred to AP Expense were transferred to AP Vendor Relations following

the implementation of new RETEK software that expanded the capabilities of AP Vendor

Relations.  (Shulman Aff. Ex. E.)  Due to these consolidations, ten employees were

terminated.  (Shulman Aff. Ex. F.)

In a memorandum to employees of AP Service and Support, Best Buy stated: "these

changes in no way reflect individual work performance, but instead were based on changing

work streams."  (Shulman Aff. Ex. F.)  Best Buy further informed Scheer "[t]his is expected

to be a permanent layoff."  (Shulman Aff. Ex. G.)  On June 14, 2004, ten positions were

eliminated, including Scheer's.  (Id. at Exs. A, G.)  Scheer was 61 years old at the time of

her termination.  (Id. at Ex. K.)

**3.      Scheer's Release of Claims**

On June 19, 2004, Scheer signed a "Severance Agreement & Release of Claims"[9]

(the "Agreement").  The Agreement provides that Scheer:

> acknowledges that she has received from Best Buy the job titles and ages of all
> employees whose positions are being eliminated as of 6/14/2004 and the job titles
> and ages of all employees [] whose positions were not eliminated and who work in
> the same department as her. [Scheer] understands that this information has been
> provided to her pursuant to federal law . . .

(Schmitt Aff. Ex. L at ¶ 12.)

---

[9]Best Buy has not argued that the Agreement provides a basis for summary judgment.
(Reply Mem. at 11.)

7

When Scheer signed the Agreement, Best Buy provided two lists of employees to her.  The first listed the terminated employees.  The second listed the remaining employees in AP Services and Support.  This second list stated "none remaining."  (Shulman Aff. Ex. H.)  Although AP Services and Support was disbanded, Best Buy transferred 21 employees from that group to other departments.  (Shulman Aff. Ex. K.)

On June 28, 2005, Scheer brought the instant action alleging Best Buy terminated her due to her age.

**STANDARD OF DECISION**

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ. P. 56(c); Celotex Corp. v. Cattrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50  (1986).  The moving party bears the burden of showing that the material facts in the case are undisputed.  See Celotex, 477 U.S. at 322; Mems v. City of St. Paul Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).  The nonmoving party may not rest on mere allegations or denials, but must show through the

8

presentation of admissible evidence that specific facts exist creating a genuine issue for

trial.  See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th

Cir. 1995).

## ANALYSIS

The federal Age Discrimination in Employment Act ("ADEA") and the Minnesota

Human Rights Act ("MHRA") both forbid an employer from taking adverse employment

actions against an employee because of age.  29 U.S.C. § 623(a)(1); Minn. Stat.§ 363A.08,

subd. 2(b), (c).  To establish a claim of intentional age discrimination, a plaintiff may

present direct evidence of such discrimination or prove her claim through circumstantial

evidence.  See Mayer v. Nextel West Corp., 318 F.3d 803, 806 (8th Cir. 2003).  Where the

plaintiff presents only circumstantial evidence of discrimination, the familiar burden-

shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-04 (1973),

applies.

Scheer proceeds with her age discrimination claim under the McDonnell Douglas

framework.  McDonnell Douglas sets out a three-part burden-shifting framework for

analyzing employment discrimination claims.  First, the plaintiff must establish a prima

facie case.  Although the requirements of the prima facie case vary depending on individual

circumstances, a plaintiff is generally required to show that (1) she was a member of the

protected class—i.e., over the age of forty; (2) she was meeting her employer's reasonable

expectations at the time of her termination; (3) the employer took some type of adverse

employment action against her; and (4) circumstances exist which give rise to an inference

of discrimination.  <u>Wheeler v. Aventis Pharm.</u>, 360 F.3d 853, 857 (8th Cir. 2004).  A

plaintiff may establish the fourth element of her prima facie case by showing that she was

replaced by someone substantially younger.  <u>Haas v. Kelly Servs., Inc.</u>, 409 F.3d 1030,

1035 (8th Cir. 2005).   In cases involving a RIF, however, a plaintiff must bring forward

"some additional showing that age was a factor in the termination."  <u>Nitschke v. McDonnell</u>

<u>Douglas Corp.</u>, 68 F.3d 249, 251 (8th Cir. 1995) (citations omitted); <u>see</u> <u>also</u> <u>Ahmed v.</u>

<u>American Red Cross</u>, 218 F.3d 932, 933 (8th Cir. 2000).  Scheer may make her "additional

showing" with "statistical evidence (such as a pattern of forced retirement or failure to

promote older employees) or circumstantial evidence (such as comments and practices that

suggest a preference for younger employees)."  <u>Hanebrink v. Brown Shoe Co.</u>, 110 F.3d

644, 646 (8th Cir. 1997) (internal quotations and citations omitted).

    Once the plaintiff establishes a prima facie case, the defendant "must meet a burden

of production in the second step to articulate a legitimate non-discriminatory reason for

the adverse employment action."  <u>Hannoon v. Fawn Eng'g Corp.</u>, 324 F.3d 1041, 1046 (8th

Cir. 2003) (Title VII).  Finally, if the defendant fulfills this second step, the burden returns

to the plaintiff to establish that the defendant's reason is a mere pretext for discrimination.

<u>Id.</u>

## A.    Prima Facie Case

    Best Buy argues that Scheer's prima facie case fails on the fourth element because

Scheer cannot make "some additional showing" that age was a factor in her termination as

she must in this RIF case.  In response, Scheer contends that she has both "statistical" and

"circumstantial" evidence that age was a factor in her termination.

### 1.      Dr. Warren's Statistical Analysis

Scheer proffers the statistical analysis Robert Warren, Ph.D.[10] ("Dr. Warren") to

support her contention that she was terminated because of her age.  Dr. Warren categorized

employees in six different ways.  (See Schmitt Aff. Ex. S.)  For each category, Dr. Warren

compared individuals who were terminated in the RIF to individuals who retained their

employment in the RIF to determine whether a person's age was a factor in her chances for

continued employment.

In his first analysis, Dr. Warren compared all twenty-five employees in AP Service

and Support, both retained and terminated.  (Id. at 4.)  Dr. Warren found the "mean age

difference between retained and terminated employees to be 11.24 and the mean age of

terminated employees falls 1.64 standard deviations above the mean age of all employees."

(Id.)  Dr. Warren further found that "the probability of obtaining a mean age of terminated

---

[10]Dr. Warren obtained his Ph.D. in sociology from the University of Wisconsin in
1998.  He is currently an Associate Professor of Sociology at the University of Minnesota
where he specializes in statistics, educational policy and practice, and social inequality.
(Schmitt Aff. Ex. S.)

employees that falls that many standard deviations away from the mean age of all employees is 0.10 or about 1 in 10." (Id.) Furthermore, Dr. Warren found that, among this group of employees, the probability that Best Buy would terminate the number of employees over forty that it did was 1 in 38. (Id.)

In his second analysis, Dr. Warren compared all fifty-two employees in AP Merchandise Support, both retained and terminated. (Id.) Dr. Warren found the "mean age difference between retained and terminated employees is 19.22. The mean age of terminated employees falls 3.36 standard deviations above the mean age of all employees." (Id.) Dr. Warren further found that "the probability of obtaining a mean age of terminated employees that falls that many standard deviations away from the mean age of all employees is 0.000811 or about 1 in 1,232." (Id.) Furthermore, Dr. Warren found that, among this group of employees, the probability that Best Buy would terminate the number of employees over forty that it did was 1 in 113. (Id. at 5.)

In his third analysis, Dr. Warren compared all seventy-seven employees in AP Service and Support and AP Merchandise Support, both retained and terminated. (Id.) Dr. Warren found that the "mean age difference between retained and terminated employees is 16.15. The mean age of terminated employees falls 3.62 standard deviations above the mean age of all employees." (Id.) Dr. Warren further found that "the probability of obtaining a mean age of terminated employees that falls that many standard deviations away from the mean age of all employees is 0.000313 or about 1 in 3,199." (Id.) Furthermore,

Dr. Warren found that, among this group of employees, the probability that Best Buy would terminate the number of employees over forty that it did was 1 in 5,275.  (Id.)

In his fourth analysis, Dr. Warren compared all fifty employees holding Associate and Operator positions in AP Service and Support and AP Merchandise Support, both retained and terminated.  (Id.)  Dr. Warren found "[t]he mean age difference between retained and terminated employees is 20.59.  The mean age of terminated employees falls 3.70 standard deviations above the mean age of all employees."  (Id.)  Dr. Warren further found that "the probability of obtaining a mean age of terminated employees that falls that many standard deviations away from the mean age of all employees is 0.000227 or about 1 in 4,409."  (Id.)  Furthermore, Dr. Warren found that, among this group of employees, the probability that Best Buy would terminate the number of employees over forty that it did was 1 in 1,916.  (Id. at 6.)

In his fifth analysis, Dr. Warren compared all fifty-four employees holding Associate or Operator positions in AP Service and Support, AP Merchandise Support, and AP Vendor Relations, both retained and terminated.  (Id.)  Dr. Warren found "[t]he mean age difference between retained and terminated employees is 21.29.  The mean age of terminated employees falls 3.91 standard deviations above the mean age of all employees."  (Id.)  Dr. Warren further found that "the probability of obtaining a mean age of terminated employees that falls that many standard deviations away from the mean age of all employees is 0.168 or about 1 in 10,239."  (Id.)  Furthermore, Dr. Warren found that,

among this group of employees, the probability that Best Buy would terminate the number of employees over forty that it did was 1 in 4,067.  (Id.)

In his sixth analysis, Dr. Warren compared all eleven employees holding the position of Associate 1.  (Id.)  Dr. Warren found "[t]he mean age difference between retained and terminated employees is 30.33.  The mean age of terminated employees falls 1.38 standard deviations above the mean age of all employees."  (Id.)  Dr. Warren further found that "the probability of obtaining a mean age of terminated employees that falls that many standard deviations away from the mean age of all employees is 0.168 or about 1 in 6."  (Id.)  Furthermore, Dr. Warren found that, among this group of employees, the probability that Best Buy would terminate the number of employees over forty that it did was 1 in 165.  (Id.)

From these analyses, Dr. Warren concluded that the relationship between age and selection for termination had "an incredibly strong association which can't be explained by chance and which thus must be due to something other than chance."  (Warren Dep. Tr. at 21.)  However, Dr. Warren did not claim to identify a "causal relationship" between age and selection for termination.  (Id.)

Dr. Warren also testified that he should not have performed the standard deviation analysis on groups (1) and (6) because such an analysis requires a minimum sample size of between 30 and 40.  (Warren Dep. Tr. at 60-61, 76-77.)

Scheer relies primarily on the probability theory of Dr. Warren's sixth analysis comparing all employee's holding the position of Associate 1.  Under a probability theory:

14

A finding that a disparity is statistically significant at the 0.05 or 0.01 level means that there is a 5 [percent] or 1 [percent] probability, respectively, that the disparity is due to chance. Normally, courts and social scientists, when confronted with such low probabilities, conclude that something other than chance is causing the disparity.

Craik v. Minnesota State Univ. Bd., 731 F.2d 465, n.13, 476 (8th Cir. 1984). Scheer argues she has provided an additional showing of age discrimination because Dr. Warren's analysis meets this 5 percent threshold because he concluded that, if the terminations had been random, the probability that Best Buy would terminate the number of Associate 1s over the age of forty that it did was 1 in 165.

Best Buy argues that Dr. Warren's sixth analysis is insufficient to satisfy an additional showing of age discrimination because it determined that the mean age of terminated employees falls 1.38 standard deviations above the mean age of all employees. The Supreme Court has stated that, generally, claims that terminations were not the product of discrimination are suspect "if the difference between the expected value and the observed number is greater than two to three standard deviations." Hazelwood Sch. Dist. v. United States, 433 U.S. 299, n.14, 308 (1977) (quoting Castaneda v. Partida, 430 U.S. 482, 496-97, n.17, 497 (1977)) (the "Castaneda footnote"). Best Buy argues that Dr. Warren's findings are invalid because they fall below the Castaneda footnote's "requirement" of 2 standard deviations.

The Eighth Circuit, however, has rejected the argument Best Buy makes here:

If a legal rule can properly be derived from the Castaneda footnote, it can only be that standard deviations greater than two or three necessarily exclude chance as a cause of underrepresentation. The converse of this—that standard deviations of not

15

"more than two or three" necessarily exclude discriminatory design as the cause—is nowhere implied.

Craik, 731 F.2d at 476, n.13.  Consequently, while Best Buy is correct in noting that 1.38 standard deviations is insufficient statistical evidence of employment discrimination, the finding of 1.38 standard deviations does not prevent Scheer from presenting other statistical evidence to fulfill her requirement of making an additional showing of employment discrimination.  Rather, Dr. Warren's "probability analysis"—his conclusion that the percentage of Associate 1's over the age of forty terminated by Best Buy had a 1 in 165 chance of occurring at random—meets the 5 percent threshold necessary for establishing an additional showing of employment discrimination.

Best Buy next argues that Dr. Warren's "probability analysis" is ineffective to provide an additional showing of age discrimination because the sample size of Associate 1s is too small to produce statistically significant results.  Dr. Warren admits his sample size of eleven is too small to provide an accurate standard deviation analysis.  (Warren Dep. Tr. at 61-62, 76-77.)  However, Scheer argues that Dr. Warren's "probability analysis" is still valid despite the small sample size.

Statistical results may be insufficient to establish a prima facie case of discrimination when they are derived from a small sample of individuals.  Lewis v. Aerospace Cmty. Credit Union, 114 F.3d 745, 750 (8th Cir. 1997) (sample size of three too small to establish a prima facie case of age discrimination).  However, to establish a prima facie case, the standard in evaluating statistical evidence is low.  MacDissi v.

16

Valmont Indus., Inc., 856 F.2d 1054, 1058 (8th Cir. 1988) ( "[T]he adequacy of numerical comparisons within small sets of data depends on the degree of certainty the factfinder requires, as well as the type of inference the statistics are meant to demonstrate."). Scheer provides evidence that, among the eleven Associate 1s, all eight over the age of forty were terminated, while all three under the age of forty were retained.  (Schmitt Aff. Ex. S.)  Such evidence is "surely the kind of fact which could cause a reasonable trier of fact to raise an eyebrow, and proceed to assess the employer's explanation for this outcome." MacDissi, 856 F.2d at 1058 (finding that prima facie case was established when, in a group of nine employees, the two oldest were selected for termination). Therefore, the Court determines Dr. Warren's "probability analysis" is sufficient to make a prima facie showing that Scheer was discriminated against during the RIF because of her age.

Scheer also proffers Dr. Warren's five other analyses as statistical evidence of age discrimination.  Best Buy contends, however, that these analyses are invalid because they combine the Associate 1s with other positions evaluated before the RIF.  Statistical evidence does not support an allegation of employment discrimination unless it analyzes the treatment of comparable employees.  Evers v. Alliant Techsystems, Inc., 241 F.3d 948, 956 (8th Cir. 2001); see also Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 350 (6th Cir. 1998).  Statistics fail to analyze the treatment of comparable employees when they have "grouped all employees together regardless of specialty or skill and failed to take into account nondiscriminatory reasons for the numerical disparities." Furr v. Seagate

17

Technology, Inc., 82 F.3d 980, 987 (10th Cir. 1996).  In the instant case, Millerbernd,

Dahl, and Reitan recommended that Scheer be terminated after concluding her position

should be eliminated because her services were not needed.  Dr. Warren's analyses fail to

provide an additional showing of age discrimination because they group together

employees of varying skills and specialties and fail to consider Best Buy's potential

nondiscriminatory motive of improved efficiency through a RIF.

Scheer contends that Dr. Warren's forth and fifth analyses, comparing all levels of

Associates and Operators, provides an additional showing of age discrimination because all

Associate positions were clerical, "entry level" positions that did not involve independent

work.  Scheer also points to the fact that she handled other employees' job duties when they

were ill as evidence that her position was similar to other positions and should have been

compared against those positions.  Regardless of Scheer's contentions, the evidence

establishes that the individuals deciding which positions to eliminate viewed these

positions as different.[11]  (Powers Dep. Tr. at 38; Dahl Dep. Tr. at 6-7.)  Scheer presents no

evidence to rebut this.  Accordingly, these analyses by Dr. Warren fail to provide an

additional showing of discrimination.

------

[11]Scheer argues that it was Powers, rather than Millerbernd, who filled out the
worksheets establishing which positions to eliminate.  (Mem. in Opp'n at 9.)  However,
Scheer's contention is based solely on the fact that Powers' name appears at the top of the
worksheets.  (Schmitt Aff. Exs. M, N.)  Scheer has not rebutted the evidence that Powers
assigned this task to Millerbernd, Dahl, and Reitan and accepted their recommendations.

Finally, Scheer argues that Dr. Warren's comparison of all Associate positions was proper because, as she alleges, Best Buy promoted certain Associate 1s to higher level Associate positions in advance of the RIF to prevent those individuals from being terminated during the RIF. However, assuming this allegation is true, Dr. Warren's analysis is not limited to those individuals promoted out of the Associate 1 position shortly before the RIF. Rather, Dr. Warren's analysis combines all individuals in the Associate and Operator positions, regardless of when they attained their position. Accordingly, only Dr. Warren's "probability analysis" of his sixth analysis provides an additional showing of discrimination.

### 2.     Non-statistical evidence of discrimination

Scheer also argues that Best Buy violated its own policies during the RIF by treating her differently than other similarly situated employees and she relies on this alleged deviation from established policies to establish her prima facie case of age discrimination. In support of this argument, Scheer cites Ledbetter v. Alltel Corp., 437 F.3d 717, 722 (8th Cir. 2006) for the proposition that "[a]n employer's failure to follow its own policies may support an inference of pretext" (citing Floyd v. State of Mo. Dep't of Soc. Servs., 188 F.3d 932, 937 (8th Cir. 1999)). The Court notes that the language in both Ledbetter and Floyd cited above refers to the issue of pretext, not a plaintiff's prima facie case. However, for the purpose of the instant Motion, the Court assumes the rule is the same for Scheer's prima facie case.

19

Initially, Scheer alleges Best Buy violated its own policy when it "lost, hid, or destroyed the adverse impact analysis it performed on the April 2004 restructuring." (Mem. in Opp'n. at 25).  Scheer's contention that Best Buy "lost, hid, or destroyed" the adverse impact analysis is based solely on Best Buy's failure to produce such an analysis during discovery.  However, Scheer fails to establish that Best Buy had a "policy" of performing adverse impact analyses or that an adverse impact analysis existed in the instant case.  Melanie Douglas, an employee in Best Buy's Human Resources Department, testified that Best Buy had a "practice" of performing adverse impact analyses but that these adverse impact analyses "weren't always formally documented. Depends on size, makeup of group."  (Douglas Dep. Tr. at 151)  Furthermore, she testified that, although she recalled having numerous conversations about the adverse impact of the RIF, she did not recall whether an adverse impact analysis was performed on the RIF.  (Id.)  Accordingly, Scheer has provided no evidence that an adverse impact analysis was formally documented in the instant case and therefore has no evidence that Best Buy violated its own policy by losing, hiding, or destroying the analysis.

Second, Scheer alleges Best Buy deviated from the language of the Agreement when it failed to list the twenty-one individuals from AP Services and Support that were transferred to other departments.  However, Douglas testified that Best Buy believed it was required to list only those individuals with the same job classification as Scheer and no individuals were listed because Scheer was the only employee performing her job.  Scheer has not presented evidence that Best Buy failed to follow its previous practices in

20

determining what data to include in the Agreement.  Therefore, Scheer has not established

that Best Buy violated its policy under the severance agreement.  Furthermore, even if Best

Buy deviated from the language in its severance agreement, Scheer has failed to establish

how this shows she was discriminated against at the time the decision was made to

terminate her.

Third, Scheer argues that Best Buy failed to compare Scheer against two other

Associate 1s on the Staffing Analysis Worksheet to determine whom to eliminate.

Although Scheer was listed as an "Accounting Assistant 2" on the worksheet, she maintains

she was an "Associate 1."  A reference letter written by Robert Vipperman, Director of

Human Resources at Best Buy, states that Scheer "had been employed with Best Buy since

10/11/1998 most recently in the position of ASSOC 1 ACCOUNTING." (Schulman Aff.

Ex. A.)  Furthermore, the Severance Agreement & Release of Claims signed by Scheer

following her termination states that she "was a[n] ASSOC 1 ACCOUNTING." (Schmitt

Aff. Ex. L.)  Scheer also testified that her job title was Associate 1 at the time of her

termination.  (Scheer Dep. Tr. at 61-62.)

However, Scheer's "Nonexempt Performance Appraisal" and job description each

list her as an "Accounting Assistant 2."  (Schmitt Aff. Ex. I; Scheer Dep. Tr. at 61-62.)  She

also testified that the job description of Accounting Assistant 2 more accurately reflected

the duties she performed than did the job description for the Associate 1 position.[12]

_____

[12]At her deposition, Best Buy's counsel showed Scheer the job description for
Accounting Assistant 2, Exhibit 7, and the job description for Associate 1, Exhibit 8: (Q:

Further, Scheer testified that she was the "only person who performed [her] job function." (Id. at 63.)

Although Scheer has produced evidence that she was classified as an Associate 1, she has not produced evidence that her position was similar to the other Associate 1s. Rather, she testified that her position was not similar to other positions. Accordingly, she has not established that she should have been compared against other individuals before she was terminated.

Finally, Scheer argues that Best Buy violated its policy of terminating temporary workers first during a RIF because it later hired temporary employees for the 2005 holiday season.[13]  (Powers Dep. Tr. at 166-72; Shulman Aff. Ex. O.)  She also argues that a RIF was not performed because the addition of these workers increased the headcount in Powers' department from 95 to 106.  (Id.)  Although Best Buy hired temporary employees one year after performing the RIF, temporary workers were the first employees terminated during the RIF.  Furthermore, Powers' headcount rose only during the holiday season when these temporary workers were employed due to increased business.  Therefore, Scheer's reliance on the employment of temporary workers during the holiday season does not establish that Best Buy violated its own policy of terminating temporary workers first during a RIF.

---

"Was this, that is Exhibit 8, the job description that was applicable to you, or was it Exhibit 7?", A: "7.").  (Scheer Dep. Tr. at 61-62.)

[13]Following the holiday season, Best Buy released many of these temporary workers.  (Powers Dep. Tr. at 171.)

For the reasons set forth above, Scheer has made out a prima facie case of employment discrimination because she has provided statistical evidence, in the form of Dr. Warren's "probability analysis," that fulfills her requirement of making an additional showing.

**B.      Pretext**

Best Buy has proffered a valid non-discriminatory reason for terminating Scheer's employment.  Best Buy contends it eliminated Scheer during a RIF.  The anti-discrimination laws "do[ ] not authorize a court to judge the wisdom of a company's business decision to reduce its workforce in response to economic pressures."  Yates v. Rexton, Inc. 267 F.3d 793, 800 (8th Cir. 2001).  Therefore, because Best Buy has proffered a valid, non-discriminatory motive for terminating Scheer, she must establish this reason is mere pretext.

Dr. Warren's "probability analysis" in his sixth statistical analysis is insufficient to support a finding that Best Buy's justification for terminating Scheer was pretext.  Statistical results may be invalid to establish a plaintiff's ultimate burden of proving age discrimination if they are derived from a small sample size.  See Mems., 224 F.3d at 740 (sample size of three to seven was too small to be statistically significant) (citing Shutt v. Sandoz Crop Prot. Corp., 944 F.2d 1431, 1433 (9th Cir. 1991) (sample size of eleven was too small to provide a statistical pattern of age discrimination)).  Courts have routinely determined that sample sizes of eleven are too small to demonstrate that a defendant's proffered reason for terminating a plaintiff is pretext.  See Mayor of City of Philadelphia v.

23

Educational Equal. League, 415 U.S. 605, 621 (1974) (expressing concern regarding a

sample size of 13); Shutt, 944 F.2d at 1433; Pippin v. Burlington Res. Oil & Gas Co., 440

F.3d 1186, 1198 (10th Cir. 2006) (sample size of nineteen failed to account for individual

circumstances of each employee); Schmid v. Frosch, 680 F.2d 248, 250 (D.C. Cir. 1982)

(sample size of eleven too small to be statistically significant.)  Furthermore, Scheer has

not provided "independent, direct grounds for disbelieving [Best Buy's] explanation for

[her] layoff" such that she may rest on a statistical analysis with a lesser degree of certainty

to establish pretext.  MacDissi, 856 F.2d at 1058.  Accordingly, the Court determines Dr.

Warren's sixth analysis, comparing all individuals employed as Associate 1s, is insufficient

to provide the required additional showing of age discrimination.

   Scheer also argues that Best Buy's failure to follow its own policies establishes a

pretext for employment discrimination.  (Mem. in Opp'n at 25-29.)  For the reasons set

forth above, this argument is rejected.  (See supra pp. 20-23.)

   Scheer also argues that she has established pretext because Best Buy employed

"shifting reasons" for her termination.  (Mem. in Opp'n. at 30.)  Since an employer is in the

best position to put forth the actual reason for an individuals termination, an employer's

shifting reasons for a termination may establish pretext.  See Cleveland v. Home Shopping

Network, Inc., 369 F.3d 1189, 1195 (11th Cir. 2004).  Scheer argues that Best Buy did not

conduct a RIF, even though it now proffers this as the reason for terminating her.  Scheer's

argument relies on Best Buy's addition of temporary workers during the holiday season.

For the reasons stated above (see supra pp. 22-23.), the Court determines Best Buy did

conduct a RIF and Scheer's allegation that Best Buy shifted its reason for terminating her is rejected.

Finally, Scheer argues that Best Buy provided shifting reasons because it proclaimed that terminations "in no way reflect[ed] individual work performance" while Dahl testified she recommended Scheer for termination because her "data entry skills didn't meet the requirements of the new position." (Dahl Dep. Tr. at 36.) However, Dahl further stated that she would have recommended Scheer's termination even if her data entry skills had been better. (Id. at 38-39.) Furthermore, Scheer presents no evidence that Best Buy did not eliminate the position during the RIF or that Best Buy should have terminated another employee instead of her. (Scheer Dep. Tr. at 6-11, 21). Consequently, Scheer has failed to establish Best Buy's RIF, and her termination during that RIF, was a mere pretext for her termination.

The Court concludes Scheer has failed to establish Best Buy's RIF was a pretext and that her termination was due to her age. The Court also concludes Scheer has failed to establish Best Buy's RIF was a mere pretext for age discrimination. Accordingly, Best Buy's Motion will be granted and the Complaint will be dismissed with prejudice.

## CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein **IT IS ORDERED** that Defendant Best Buy's Motion for Summary Judgment (Doc. No. 22) is

**GRANTED** and Plaintiff Maryann Scheer's Amended Complaint (Doc. No. 8) is

**DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: September 13, 2006                    s/Richard H. Kyle
                                             RICHARD H. KYLE
                                             United States District Judge

26